**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

INSPIRA HEALTH NETWORK,

       Plaintiff,

      v.

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY,

       Defendant.

No. 1:21-cv-11124

**OPINION**

<u>**APPEARANCES**</u>:

Ellis I. Medoway
ARCHER & GREINER, PC
One Centennial Square
Haddonfield, NJ 08033

Trevor J. Cooney
ARCHER & GREINER, PC
1025 Laurel Oak Road
Voorhees, NJ 08043

    *On behalf of Plaintiff.*

Charles Andrew Booth, Sr.
FORD MARRIN ESPOSITO WITMEYER & GLESSER, LLP
Wall Street Plaza
Floor 16
New York, NY 10005

John Albert Mattoon, Jr.
FORD MARRIN ESPOSITO WITMEYER & GLESSER, LLP
Wall Street Plaza
Floor 16
New York, NY 10005

    *On behalf of Defendant.*

**O'HEARN, District Judge.**

This matter comes before the Court on Defendant American Guarantee and Liability Insurance Company's ("Defendant" or "AGLIC") Motion to Dismiss, (ECF No. 33), the Complaint filed by Plaintiff Inspira Health Network ("Plaintiff"), (ECF No. 1-1). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons that follow, Defendant's Motion is **GRANTED**.

### I.       BACKGROUND

 Plaintiff is one of Southern New Jersey's "leading network[s] of healthcare providers, delivering the full continuum of primary, acute and advanced care services." (Compl., ECF No. 1- 1, ¶ 5). Its system comprises "three hospitals, two comprehensive cancer centers, several multi- specialty health centers and a total of more than 150 access points" ("Insured Location")  throughout  Gloucester, Cumberland, Salem, Camden, and Atlantic counties. (ECF No. 1-1, ¶ 5). It employs approximately 7,500 people across its facilities. (ECF No. 1-1, ¶ 7). Among the various healthcare services Plaintiff provides are elective surgical and invasive procedures. (ECF No. 1-1, ¶ 6).

Plaintiff contracted with Defendant, an insurance company, for business insurance coverage under Defendant's "Zurich EDGE Healthcare" plan, securing a policy effective January 1, 2020, through January 1, 2021 ("the Policy"). (Compl., ECF No. 1-1, ¶ 8; Ex. A to Compl., ECF 1-1). Among other terms, the Policy includes "special coverage" for business "interruption by communicable disease," ("ICD Term"). (Ex. A to Compl., ECF No. 1-1). The ICD Term provides:

> The Company will pay for the actual Gross Earnings loss sustained by the Insured, as provided by this Policy, resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension is caused by order of an authorized  governmental  agency  enforcing  any  law  or  ordinance  regulating

communicable diseases and that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the Location.

This Policy also covers the reasonable and necessary cost incurred for the cleanup, removal and disposal of the actual not suspected presence of substance(s) causing the spread of such communicable disease and to restore the locations in a manner so as to satisfy such authorized governmental agency.

This Coverage will only apply when the period of time that access is prohibited exceeds the time shown as Qualifying Period in the Qualifying Period clause of the Declarations section. If the Qualifying Period is exceeded, then this Policy will pay for the amount of loss in excess of the Policy Deductible, but not to exceed the number of consecutive days following such order as stated in the Declarations up to the limit applying to this Coverage.

This Coverage will not apply to loss or damage that is payable under any other provision in this Policy.

(Compl., ECF No. 1-1, ¶ 26; Ex. A to Compl., ECF No. 1-1).  The Policy defines "Suspension" as "[t]he slowdown or cessation of the Insured's business activities," and "Qualifying Period" as "[t]he continuous period of time expressed in hours or days which must be exceeded before coverage under this Policy begins," which for purposes of the ICD Term is twenty-four hours. (Compl., ECF No. 1-1, ¶¶ 27–29). The Policy further provides a sub-limit for coverage under the ICD Term of $1 million. (Compl., ECF No. 1-1, ¶ 11).

As all are undoubtedly aware, the COVID-19 global pandemic began sweeping the United States, including New Jersey, in early 2020, leading to still-increasing numbers of infections and deaths. (Compl., ECF No. 1-1, ¶¶ 34–44). In response to the crisis, New Jersey Governor Phil Murphy issued Executive Order No. 103, which provided:

I authorize and empower the State Director of Emergency Management, who is the Superintendent of State Police, in conjunction with the Commissioner of DOH, to take any such emergency measures as the State Director may determine necessary, including the implementation of the State Emergency Operations Plan and directing the activation of county and municipal emergency operations plans, in order to fully and adequately protect the health, safety and welfare of the

3

citizens of the State of New Jersey from any actual or potential threat or danger
that may exist from the possible exposure to COVID-19.

(Compl., ECF No. 1-1, ¶ 45).

After the World Health Organization also designated COVID-19 as a global pandemic

and the President of the United Stated declared it a national emergency, (Compl., ECF No. 1-1,

¶¶ 46–47), Governor Murphy issued a series of further orders aimed at stopping the spread of the

disease. (Compl., ECF No. 1-1, ¶¶ 48–49). Executive Order No. 104, dated March 16, 2020,

restricted gatherings to fifty persons or fewer and ordered closures, or restrictions, of certain

establishments but expressly excluded "healthcare facilities and ancillary stores within

healthcare facilities" from the Order.[1] (Morris Decl. Ex. 2, ECF No. 33, p. 5–7). Thereafter,

Executive Order No. 107 ordered that all New Jersey residents "shall remain home" unless they

are "seeking medical attention," among other exceptions, and required "[t]he brick-and-mortar

premises of all non-essential retail businesses must close to the public as long as this Order

remains in effect." (Compl., ECF No. 1-1, ¶¶ 48–49; Morris Decl. Ex. 3, ECF No. 33, p. 5–6).

The Order, however, expressly stated "[n]othing in this Order shall be construed to limit,

prohibit, or restrict in any way the provision of health care or medical services to members of the

public." (Morris Decl. Ex. 3, ECF No. 33, p. 12).

Most relevant here is Executive Order No. 109, which suspended all elective surgeries

and invasive procedures performed on adults in the state:

Beginning at 5:00 p.m. on Friday, March 27, 2020, all "elective" surgeries
performed on adults, whether medical or dental, and all "elective" invasive
procedures performed on adults, whether medical or dental, are suspended in the

---

[1] On a Rule 12(b)(6) motion, courts may only consider allegations contained in the
complaint, exhibits attached to complaint, and matters of public record. *Pension Ben. Guar.
Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The court may also
consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit
to a motion to dismiss if the plaintiff's claims are based on the document." *Id.*

State. An "elective" surgery or invasive procedure, for purposes of this Order, is
defined as any surgery or invasive procedure that can be delayed without undue
risk to the current or future health of the patient as determined by the patient's
treating physician or dentist. An "elective" surgery or invasive procedure does not
include the administration of vaccines.

(Compl., ECF No. 1-1, ¶ 51). Governor Murphy issued the Order, in part, to "take additional

steps to preserve our health care system's capacity to treat those who require emergency or

intensive care," limit "exposure of healthcare providers, patients, and staff to COVID-19," and

conserve critical medical resources to combat the spread of the virus. (Morris Decl. Ex. 4, ECF

No. 33, p. 3). In compliance with this Order, Plaintiff ceased all elective procedures at the

appointed time. (Compl., ECF No. 1-1, ¶ 56). This work did not resume until May 26, 2020,

after Governor Murphy rescinded Executive Order No. 109. (Compl., ECF No. 1-1, ¶ 59; Morris

Decl. Ex. 5, ECF No. 33).

During this interruption, Plaintiff alleges that it endured a significant loss of gross

earnings: more than $20 million. (Compl., ECF No. 1-1, ¶ 63). Accordingly, Plaintiff filed a

claim with Defendant on April 14, 2020, seeking coverage under the Policy's ICD Term.

(Compl., ECF No. 1-1, ¶ 67). In a May 5, 2020 letter, Defendant stated that it needed time to

investigate Plaintiff's claim. (Compl., ECF No. 1-1, ¶ 68). On March 8, 2021, Defendant

communicated via e-mail that it would deny coverage. (Compl., ECF No. 1-1, ¶ 70). Plaintiff

responded by filing suit. (Compl., ECF No. 1-1).

## II.   PROCEDURAL HISTORY

On March 30, 2021, Plaintiff commenced this action in the Superior Court of New

Jersey, Gloucester County, seeking a declaratory judgment that Defendant must cover Plaintiff's

losses up to $1 million as contemplated by the ICD Term of the Policy. (Compl., ECF No. 1-1).

The New Jersey Department of Banking and Insurance accepted service on Defendant's behalf

on April 12, 2021. (Notice of Removal, ECF No. 1, ¶ 3). Defendant timely removed the case to

this Court on May 12, 2021, under 28 U.S.C. §§ 1441 and 1446, invoking this Court's diversity

jurisdiction under 28 U.S.C. § 1332. (Notice of Removal, ECF No. 1).

After the grant of a series of extensions of time for Defendant to respond to Plaintiff's

Complaint (ECF Nos. 4, 6), the parties submitted a joint request for a sixty-day stay of

proceedings in this matter on June 8, 2021, to explore settlement. (ECF No. 9). The parties also

requested that if the Court granted the stay, it should still allow the filing of a Motion for

Remand that Plaintiff intended to submit in the days to follow. (ECF No. 9). The Court granted

both requests on June 9, 2021, (ECF No. 10), and Plaintiff's Motion to Remand was filed the

next day, (ECF No. 11).

After the parties were unable to resolve this matter within the original sixty-day stay of

proceedings, the Court granted a series of extensions. (ECF Nos. 21, 23, 26). Unfortunately, the

parties remained unable to come to an agreement, and the matter was returned to active status on

February 4, 2022. (ECF No. 28). On March 21, 2022, the Court denied Plaintiff's Motion for

Remand. (ECF No. 31). Defendant thereafter filed the present Motion to Dismiss.  (ECF No. 33).

Plaintiff filed a Response (ECF No. 35), to which Defendant replied, (ECF No. 36).

## III.    LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(6)

To state a claim, a complaint needs only to provide a "short and plain statement of the

claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Although "short and

plain," this statement must "give the defendant fair notice of what the claim is and the grounds

upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quotations,

alterations, and citation omitted). "[A] plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* (citations omitted). Rather, a complaint must contain sufficient factual allegations "to state a claim to relief that is plausible on its face." *Id.* at 547.

When considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must accept the complaint's well-pleaded allegations as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). Through this lens, the court then conducts a three-step analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Next, the court should identify and disregard those allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. *Id.* Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678).

On a Federal Rule of Civil Procedure 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). As noted, the court may only consider the facts alleged in the pleadings, any attached exhibits, and any matters of judicial notice. *S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). The court may also consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion . . . if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol.*

7

*Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### B. New Jersey Law on Insurance Policy Interpretation[2]

The interpretation of an insurance policy is a question for the Court to decide as a matter of law. *Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Cas. Co. of Am.*, 559 F. Supp. 2d 504, 510 (D.N.J. 2008). Under New Jersey law, "[a]n insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010) (citations omitted). The policy language is interpreted "according to its plain and ordinary meaning." *Id.* (quoting *Vorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1260 (N.J. 1992)). If the policy language is clear, that is the end of the inquiry. *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008). Indeed, "in the absence of an ambiguity, a court should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one purchased." *Id.* (quoting *Progressive Cas. Ins. Co. v. Hurley*, 765 A.2d 195, 202 (N.J. 2001)).

However, "[i]f the terms are not clear, but instead are ambiguous, they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations." *Flomerfelt*, 997 A.2d at 996. When an ambiguity exits, "coverage clauses should be interpreted liberally, whereas those of exclusion should be strictly construed." *Simonetti v. Selective Ins. Co.*, 859 A.2d 694, 693 (N.J. Super. Ct. App. Div. 2004) (citing *Butler v. Bonner & Barnewall, Inc.*, 267 A.2d 527, 532 (N.J. 1970)). "However, ambiguities will not be forced into an insurance policy nor will the words of an insurance policy be artfully construed to include a

---

[2] Both Plaintiff and Defendant concur that New Jersey law is applicable for purposes of the Motion to Dismiss. (Def.'s Br., ECF No. 33, p. 10 n.3; Pl.'s Br., ECF No. 35, p. 17 n.3).

type of coverage outside the scope and nature of the policy in question." *N&S Rest. LLC v. Cumberland Mut. Fire Ins. Co.*, 499 F. Supp. 3d 74, 78 (D.N.J. 2020) (citing *Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 843 A.2d 1094, 1103 (N.J. 2004)).

## IV.    DISCUSSION

Defendant has moved for dismissal of Plaintiff's Complaint, (ECF No. 1-1), under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff cannot state a claim for coverage under the ICD Term because it did not establish the prohibition of access requirement, (ECF No. 33). After reviewing the insurance policy, the Court concludes that Plaintiff has failed to allege sufficient factual allegations to state a claim for coverage under the ICD Term. Accordingly, for these reasons that follow, the Court grants Defendant's Motion.

### A.  The Language of the ICD Term is Unambiguous

Both parties agree that Plaintiff's claim for coverage only concerns the ICD Term. (Compl., ECF No. 1-1, ¶ 24; Pl.'s Br., ECF No. 35, p. 2; Def.'s Br., ECF No. 33, p. 12). To allege a claim under the ICD Term, Plaintiffs must allege that a "necessary Suspension of the Insured's business activities at an Insured Location" was: (1) "caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases" and (2) "that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the location." (Compl., ECF No. 1-1, ¶ 26; Ex. A to Compl., ECF No. 1-1).

It is not disputed that Plaintiff pled sufficient factual allegations regarding the existence of an "order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases." (Compl., ECF No. 1-1, ¶ 26; Ex. A to Compl., ECF No. 1-1). However, whether any of the Executive Orders suspended Plaintiff's business activities such that "portions of the location [were] declared uninhabitable due to the threat of the spread of

9

communicable disease, prohibiting access to those portions of the location" to trigger coverage is disputed.

In the Complaint, Plaintiff alleges that it was "prevented from providing 'elective' medical care from March 27, 2020, through May 26, 2020 based on the Executive Orders." (Compl., ECF No. 1-1, ¶ 61). Plaintiff also alleges that "[b]etween March 27, 2020, and May 26, 2020, Inspira sustained a significant loss of Gross Earnings – more than $20,000,000 – resulting from the necessary suspension of its 'elective' surgeries and 'elective' invasive procedures performed at its Insured Locations, as required by Executive Order No. 109." (Compl., ECF No. 1-1, ¶ 63). Additionally, and most relevant here, Plaintiff alleges, "Executive Order No. 109 prohibited access to those portions of Inspira's Insured Locations for 'elective' surgeries and 'elective' invasive procedures and declared those portions of Inspira's Insured Locations uninhabitable for those medical services due to the threat of the spread of COVID-19, a communicable disease." (Compl., ECF No. 1-1, ¶ 65).

These factual allegations, however, fail to show that Plaintiff has a plausible claim for relief. The Executive Orders did not prohibit access to Plaintiff's Insured Location. Instead, Executive Order No. 109 suspended certain activities, specifically "elective" surgeries and invasive procedures at the Insured Location. In other words, the Executive Order restricted certain activities on the Insured Location but did not prohibit access to the Insured Location as is required to trigger coverage under the ICD Term.

To date, every court that has addressed whether similar governmental orders suspending elective surgeries and invasive procedures triggered coverage under the same or a similar ICD Term has found that it does not because the orders did not prohibit access to any location. *See Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108, 118–20 (S.D.N.Y. 2021)

(finding, for motion to dismiss, plaintiff failed to establish that ICD coverage extends to its claim

because New York Governor's Orders "do not require hospitals to close certain buildings, only

to suspend elective procedures; if a hospital wanted to use facilities ordinarily used for elective

procedures to conduct emergency ones, nothing in the Orders forbids this. While the Orders

certainly restrict access to hospitals, they fall short of 'prohibiting' access."); *Healthpartners,*

*Inc. v. American Guar. & Liab. Ins. Co.*, 587 F. Supp. 3d 874, 884 (D. Minn. 2022) (determining

plaintiff had not plausibly pled facts that triggered same ICD term coverage for motion to

dismiss because "[n]othing in the Government Orders suggests that any HealthPartners location

was declared uninhabitable. Minnesota simply restricted operations by prohibiting non-essential

and elective surgeries and procedures. And Wisconsin exempted healthcare facilities—like

HealthPartners' locations—from the stay-at-home order."); *St. Tammy Parish Hosp. Serv. Dist.*

*No. 2 v. Zurich Amer. Ins. Co.*, ___ F. Supp. 3d ___ (E.D. La. 2022) (concluding plaintiff not

entitled to recover under identical ICD provision, in motion to dismiss, because "[t]o recover

under a provision . . . providing coverage when . . . [a] governmental agency prohibits access to

the insured premises, a 'complete prohibition of access' is required. In this case, even the most

stringent governmental orders did not completely forbid access to Plaintiff's premises; rather, the

orders temporarily restricted Plaintiff's ability to use its facilities . . . ."); *Billings Clinic v. Amer.*

*Guar. & Liab. Ins. Co.*, No. 21-32, 2022 WL 773207, at *7 (D. Mont. Feb. 22, 2022)

(concluding plaintiff had not alleged facts to establish coverage under the ICD provision

plausibly showing any portion of its location was uninhabitable or any facts explaining "how,

when and where access to its locations was prohibited" in a motion to dismiss); *Palomar Health*

*v. American Guar. & Liab. Ins. Co.*, No. 21-0490, 2021 WL 4035005, at * 9 (S.D. Cal.  Sept. 3,

2021) (determining plaintiff's claim for indemnification from AGLIC under same ICD provision

fails because plaintiff did not assert it was prohibited by a government order from entering its facility in a motion to dismiss).

Similarly, courts that have reviewed analogous claims for insurance coverage under a policy's civil authority endorsements, which also require, among other things, "action of civil authority that prohibits access to the described premises," have too found that COVID-19 orders did not *prohibit* access to any insured's location. *See Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 523 F. Supp. 3d 147, 154 (D. Mass. 2021) (determining COVID-19 executive orders limited, rather than, prohibited access to plaintiff's properties in a motion to dismiss); *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, 488 F. Supp. 3d 690, 694 (N.D. Ill. 2020) (finding COVID-19 orders limited plaintiff's operations but no order prohibited access to plaintiff's premises in a motion to dismiss); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, 499 F. Supp. 3d 95, 100 (E.D. Pa. 2020) (finding executive order closing the plaintiff's office for all non-emergency dental services "limit[ed], rather than prohibit[ed], access to the property" in a motion to dismiss); *Riverside Dental of Rockford, LTD. v. Cincinnati Ins. Co.*, No. 20-CV-50284, 2021 WL 346423, at *5 (N.D. Ill. Jan. 19, 2021) (determining, in motion to dismiss, executive order requiring dental offices to cease providing services identified as non-essential did not "forbid or prevent the ability to enter plaintiff's dental office" but instead limited the types of services that could be provided at the office); *Mac Prop. Grp. LLC & The Cake Boutique LLC v. Selective Fire & Cas. Ins. Co.*, 278 A.3d 272, 289 (N.J. Super. Ct. App. Div. 2022) (noting New Jersey's Executive Orders "neither prohibited access to plaintiffs' premises nor prevented plaintiff owners from being on their premises, but merely restricted their business activities" in a motion to dismiss).

While Plaintiff accurately notes that to date no state or federal court in New Jersey has

12

interpreted the ICD Term, there is nothing factually nor legally distinguishable in this case that

warrants departing from the long list of courts throughout the country that have concluded that

similar COVID-19 orders restricting certain activities did not prohibit access to those locations.

Moreover, the out-of-state authorities are consistent with well-established New Jersey principles

of enforcing clear policy words as written according to their plain and ordinary meaning. *See*

*Prohibit*, BLACK'S LAW DICTIONARY (11th Ed. 2019) (defining "prohibit" as to "[t]o forbid by

law [,] [t]o prevent, preclude, or severely hinder"). That Defendant's affiliate, Zurich, paid a

claim to a different insured under the same ICD Term does not create coverage for Plaintiff's

claim. *See Valley Health Sys. V. Zurich Amer. Ins. Co.*, No. 21-1907, 2021 WL 4958349, at *1

(N.J. Super. Ct. Law Div. Oct. 18, 2021) (noting "Following an investigation, [Zurich] agreed to

pay the limits of the Interruption by Communicable Disease coverage under the policy, which

extends certain limited coverage for certain losses from a government order due to the threat of

the spread of communicable disease, without a showing of direct physical loss or damage."); *but*

*see Danville Reg'l Med. Center, LLC v. American Guar. & Liab. Ins. Co.*, No. 21-0012, 2022

WL 521460, at *4 (W.D. Va. Feb. 22, 2022) (noting "Zurich . . . denied the ICD claim").

Accordingly, Plaintiff fails to plead sufficient factual allegations that any Executive

Order prohibited access to its Insured Location.

## B. The Illusory Coverage Doctrine Does Not Apply

Plaintiff also argues that Defendant's "suggested interpretation of the ICD Term would

effectively nullify coverage and render it illusory." (ECF. Pl.'s Br., ECF No. 35, p. 29–30).

Plaintiff maintains "[t]o accept [Defendant's] interpretation of the Policy's ICD provision is

tantamount to acknowledging there could never be any coverage under that provision because a

governmental agency is never going to entirely shut down Inspira, or any other health care

system, especially when confronting a pandemic that requires a coordinated and evolving

medical response." (ECF. Pl.'s Br., ECF No. 35, p. 30).

"Coverage under an insurance policy is considered 'illusory' where a premium is paid for a particular type of coverage and that coverage turns out to be functionally nonexistent." *Sweetberry Holdings LLC v. Twin City Fire Ins. Co.*, No. 20-8200, 2021 WL 3030269, at *8 (D.N.J. 2021). Courts, however, should seek to enforce contracts and avoid deeming them illusory. *Del Sontro v. Cendant Corp.*, 223 F. Supp. 2d 563, 578 (D.N.J. 2002) (citing *Russell v. Princeton Labs. Inc.,* 231 A.2d 800, 805 (N.J. 1967)).

Contrary to Plaintiff's contention, interpreting the ICD Term in this manner does not render coverage illusory. It delivers to Plaintiff the clear terms of its insurance policy. The Policy provides coverage if an executive order "prohibits access to those portions of the Location." (Compl., ECF. No 1-1, ¶ 26). It does not require that the order prohibit access to the entire healthcare facility. Here, Executive Order No. 109 simply restricted the activities allowed to be performed on the premises. Coverage here was conditioned on a specific set of facts, which simply did not occur.

### C.  The Reasonable Expectations Doctrine Does Not Apply

Plaintiff next argues that Defendant's interpretation of the ICD Term contravenes its reasonable expectations. (Pl.'s Br., ECF No. 35, p. 30–33). Plaintiff, however, does not appear to advance an argument that the ICD Term is ambiguous other than to say "if the ICD provision is determined to be susceptible to two reasonable interpretations and is thus found to be ambiguous, the Policy's language – drafted only by AGLIC – must be construed against the insurer and in favor of the insured" and "if Defendant's restrictive interpretation is allowed consideration, Inspira's reasonable expectations override that construction." (Pl.'s Br., ECF No. 35, p. 26 n.5, 30–33). In the absence of an ambiguity, New Jersey courts consider reasonable expectations only

14

in exceptional circumstances.

New Jersey has "recognized the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing, and in *exceptional circumstances*, when the literal meaning of the policy is plain." *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006) (quoting *Nav-Its, Inc. v. Selective Ins. Co. of Amer.*, 869 A.2d 929, 934 (N.J. 2005)) (emphasis in original).  New Jersey courts "will depart from the literal text and interpret it in accordance with the insured's understanding, even when that understanding contradicts the insurer's intent, if the text appears overly technical or contains hidden pitfalls, cannot be understood without employing subtle or legalistic distinctions, is obscured by fine print, or requires strenuous study to comprehend." *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1268 (N.J. 2001) (internal citations omitted). "The Third Circuit has observed, however, that while '[t]he New Jersey doctrine allowing the reasonable expectations of the insured to override the plain meaning of a policy in exceptional circumstances [is] often stated, [it] has rarely been applied by the New Jersey Supreme Court.'" *Causeway Auto., LLC v. Zurich Am. Ins. Co.*, No. 20-8393, 2021 WL 486917, at *7 (D.N.J. Feb. 10, 2021) (quoting *Colliers Lanard & Axilbund*, 869 A.2d at 236).

Plaintiff has not alleged any facts suggesting "exceptional circumstances." The language of the ICD Term is plain, not "overly technical," and its structure does not contain "hidden pitfalls," and Plaintiff has not alleged any factual allegations suggesting otherwise.  Given that the language of the ICD Term is clear and there is no reason to override the unambiguous language of the Policy, the Court declines to apply the reasonable expectations doctrine. *See ABC Child.'s Dentistry, LLC v. Hartford Ins. Co.*, No. 20-10004, 2021 WL 4272767, at *6 (D.N.J. Sept. 21, 2021) (noting "unprecedented global pandemic" did not provide reason to

override unambiguous insurance policy language).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED**. (ECF No. 33).

An appropriate Order accompanies this Opinion.

_Christine P. O'Hearn_

**CHRISTINE P. O'HEARN**
**United States District Judge**

16